**PHOTOVEST CORPORATION, an Indiana Corporation, Plaintiff-Appellee and Cross-Appellant,**

v.

**FOTOMAT CORPORATION, a Delaware Corporation, Defendant-Appellant and Cross-Appellee.**

Nos. 77–1741, 77–1742.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1979.

Decided Sept. 24, 1979.

Rehearing and Rehearing En Banc Denied Oct. 25, 1979.

706

Edward L. Lascher, Wendy C. Wilner, Ventura, Cal., for defendant-appellant and cross-appellee.

Theodore R. Boehm, Indianapolis, Ind., for plaintiff-appellee and cross-appellant.

Before PELL, Circuit Judge, MARKEY, Chief Judge,* and WOOD, Circuit Judge.

PELL, Circuit Judge.

The defendant, Fotomat Corporation, is engaged in the retail sale of film processing, film, and camera related products which are sold insofar as the present litigation is concerned from small (9′ × 5′), "drive-thru" kiosks located generally in shopping center parking lots. It obtained the rights to this retailing concept in 1967 and opened its first stores in April of that year. It also began selling franchises, and by 1971, 1,035 units were open, 680 company stores and 355 franchised stores. These stores sell mostly to amateur photographers. The customer drives up to the side of the kiosk and gives his exposed film to a "Fotomate" who operates the kiosk. He may also purchase film or other items from the Fotomate. One or two days later the customer returns and receives the processed work. In each metropolitan area in which it operates, Fotomat runs a pickup and delivery service to the kiosks from a central area office which is staffed by an area manager and some assistants. A route driver runs a daily pickup and delivery circuit of all the kiosks in the area, delivering the previous day's developed film and picking up that day's film. At the end of the route, the driver delivers the film to the processor.

The plaintiff, Photovest Corporation, was formed in 1968 by three individuals desiring to invest in Fotomat franchises. Photovest was incorporated for the purpose of operating a block of Fotomat kiosks in the Indianapolis area. On August 26, 1968, Photovest signed a master franchise purchase agreement obligating it to purchase 15 franchises to operate 15 Fotomat stores in Marion County, Indiana. Specific store sites had not been selected, but each store was bound by the standard Fotomat franchise agreement and the standard Fotomat lease agreement, which would be separately signed upon the opening of each store. Photovest agreed to pay $21,000 for each franchise for a total of $315,000. It also agreed to pay Fotomat royalties and advertising fees based on monthly gross sales. Additional details of the franchise agreement as well as other pertinent facts will be set forth throughout this opinion where relevant to the specific argument being discussed.

In December 1974, Photovest filed this action[1] charging Fotomat, *inter alia*, with violations of both federal and state antitrust laws, breach of contract, fraud, and tortious breach of contract. After trial in the district court, the judge made extensive findings of fact and conclusions of law and awarded Photovest damages totaling $3,017,161.86. Prior to the district court's decision, Fotomat had paid Photovest $41,-484.53 which reduced the final judgment to $2,923,557.

In this appeal, Fotomat raises numerous arguments regarding the antitrust, breach of contract, and damages aspects of the district court's decision. It also argues that some of the procedures followed by the district court judge violated Fotomat's due process rights. We will address one of these procedural problems first.

---

* Chief Judge Howard T. Markey of the United States Court of Customs and Patent Appeals is sitting by designation.

1. Photovest amended its complaint on several occasions throughout the litigation. Our discussion proceeds on the basis of the final amended complaint.

## I. EXCHANGE OF BRIEFS PROCEDURE

Fotomat argues that it was prejudiced, and indeed was deprived of due process, by the fact that Photovest submitted an extensive trial brief to the district court judge without at the same time providing Fotomat with a copy. On Friday, December 3, 1976, Fotomat's counsel first discovered that Photovest had earlier filed a 207 page trial brief with the district court judge and that Photovest did not intend to serve a copy on Fotomat. Earlier that day Fotomat had given Photovest a copy of its trial brief. Since the trial was to begin on Monday, December 6, 1976, Fotomat immediately complained to the judge of the *in camera* filing. The judge found that the pretrial order did not require pretrial exchange of briefs and that there was no record of any agreement to such an exchange. He said he "would leave counsel where they find themselves." At that time, Photovest agreed to return Fotomat's trial brief which Fotomat had earlier served on it. On Monday, December 6, the first day of trial, Fotomat filed a motion to reconsider and the judge granted a hearing. After hearing arguments on the exchange of briefs issue, he ordered Photovest to serve its brief on Fotomat with some modifications. Photovest was allowed to edit and delete certain portions of its brief "to avoid tipping off Fotomat's witnesses." It served the edited brief on Fotomat on December 16, 1976, the ninth day of the trial. Trial was then recessed for two months. The judge advised Fotomat that it could submit a revised trial brief prior to resuming trial and could follow the same procedure as Photovest in submitting its trial brief. That is, Fotomat could submit a complete version to the court and a modified version to Photovest. All briefs were to be ex-changed at the conclusion of the trial. In January, 1977, Fotomat served Photovest with its 38-page trial brief filed with the court on December 3, 1976, and on February 11, 1977, Fotomat filed a 290-page supplemental trial brief and served a copy on Photovest. After the recess, trial resumed on February 14 at which time Fotomat again objected to not being served a copy of Photovest's unedited trial brief. Photovest then voluntarily agreed to give Fotomat a copy of the unedited version which it did later that day.

Fotomat contends that it was prejudiced by this procedure and that the procedure violates the Federal Rules of Civil Procedure and the Constitution. Before addressing the propriety of the delayed exchange of trial briefs, we note that there is in this case the additional factor that Fotomat was apparently unaware of the procedure until the first day of trial by which time Photovest had already submitted its unedited brief to the court. The record indicates that this was a result of a bona fide misunderstanding between counsel at the pretrial stages. Nothing in the record suggests any foul play or attempts to secure an unfair advantage by either party. Accordingly, the only issues are whether the procedure violates either the Federal Rules of Civil Procedure or the Constitution, or is otherwise undesirable, and if so, whether Fotomat was prejudiced by it. We also note that the delayed exchange of trial briefs is not an unusual procedure in the Southern District of Indiana. Local Rule 19(k) of the District Court for the Southern District of Indiana[2] does not appear to require pretrial exchange of trial briefs and the practice in that district is not to exchange until the conclusion of trial.

2. The rule provides:

(k) Subsequent to Pretrial Conferences. At such time as directed by the court, each party shall submit the following to the trial judge, unless notified to the contrary:

(1) A trial brief, the nature, and extent of which will be directed by the judge. Copies of all foreign statutes involved, with reference, to their source, shall also be submitted.

(2) In non-jury cases, proposed findings of fact and conclusions of law, including citations for each conclusion of law if available.

(3) In jury cases, requested charges to the jury covering issues to be litigated shall be filed in duplicate with the clerk. Each charge shall cite appropriate authority.

A copy of requested charges also shall be served on opposing counsel.

Fotomat contends that the procedure violates Rule 5(a), Fed.R.Civ.P., which requires service on all the parties of

Every order required by its terms to be served, every pleading subsequent to the original complaint unless the court otherwise orders because of numerous defendants, every paper relating to discovery required to be served upon a party unless the court otherwise orders, every written motion other than one which may be heard ex parte, and every written notice, appearance, demand, offer of judgment, designation of record on appeal, *and similar paper* . . . .

(Emphasis added.) Fotomat argues that a trial brief is a "similar paper" under Rule 5(a) and thus that the procedure employed in this case is inconsistent with Rule 5(a).[3] However, neither Fotomat nor Photovest has provided any federal case involving the application of the rule to trial briefs, and our independent research has been equally unsuccessful. Indeed, "the language of Rule 5 has given rise to little controversy." 4 Wright & Miller, Federal Practice and Procedure: Civil § 1141 at 570 (1969). As a result, we are left to write on a clean slate.

The inclusion of the words "and similar paper" in Rule 5(a) indicates that the drafters did not intend the preceding list of documents to be exhaustive. Wright and Miller state that the words suggest an expansive application of the rule. *Id.*, § 1143 at 577. Even an expansive application of the rule does not, in our opinion, clearly mandate pretrial exchange of trial briefs. Rule 5(a) provides an extensive list of documents before concluding with the phrase "and similar paper." Given the prominence and significance of the trial brief in the litigation process, its glaring absence from the list of documents specifically mentioned

in the rule supports the inference that the drafters did not intend Rule 5(a) to apply to trial briefs. This inference is buttressed by the existence of local rules like the one before us, none of which, as far as we have been able to determine, have been successfully challenged as inconsistent with Rule 5(a).[4]

We also note that the rule does not address the timing of the service. The procedure in the present case clearly provided for service on all parties since it always contemplated exchange at the close of trial. The only unusual aspect was that service on the court occurred well before service on the opposing party. Therefore, arguably the rule does not have any application to the issue before us.

Fotomat also argues that the delayed exchange procedure violates the Due Process Clause of the Fifth Amendment. Again we note the absence of any cases involving a due process challenge to a delayed exchange of trial briefs procedure. None of the cases cited by Fotomat involves a closely analogous situation, and instead, Fotomat relies on broad language from due process decisions all of which are clearly distinguishable. For example, Fotomat cites *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969), for the proposition that a party's constitutional rights are infringed if counsel for the opposing party is allowed "to convey information or to discuss any matter relating to the merits of the case" with the trial judge in the absence of opposing counsel. *Haller* was a habeas corpus case in which the petitioner raised a due process challenge to ex parte communications by the county attorney. The petitioner entered a guilty plea to a kidnapping charge in the state court; but sometime between his arraignment and his

---

**3.** Rule 83, Fed.R.Civ.P., grants district courts the authority to adopt local rules to regulate their practice "in any manner not inconsistent with these rules."

**4.** *See, e. g.*, Rule 20(c) of the District of Kansas which provides:

Any party in an action or proceeding before this court may submit a trial brief to the judge in advance of trial, provided prior notice of intention to submit such trial brief is

given to all opposing counsel of record at least three days prior to such submission. . . . Two copies of such trial brief shall be delivered to the judge, but such trial brief need not be served upon opposing counsel. After the trial, all briefs shall be filed with the clerk.

*See also* E.D.Mich.Rules XV and XVI; S.D. Miss.Rule 5; E.D. and W.D.Ark.Rule 13.

sentencing, the county attorney, in the absence of petitioner and his attorney, informed the presiding judge of a statement made by the petitioner's victim of an episode of sordid behavior by petitioner while the victim was in his custody. The judge sentenced petitioner without the petitioner knowing of the ex parte communication. The court of appeals held this to be a violation of due process. The present case differs in many respects, but a critical distinction is that the trial briefs were to be exchanged after trial giving both parties an opportunity to respond to any inaccuracies or misleading information before the court rendered judgment. This fact also distinguishes and renders unpersuasive Fotomat's reliance on *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 288 n.4, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Home Box Office, Inc. v. F.C.C.*, 185 U.S. App.D.C. 142, 189, 567 F.2d 9, 56 (D.C.Cir. 1977); and *United States v. Miller*, 495 F.2d 362, 364–65 (7th Cir. 1974).

Fotomat contends that exchange after trial is too late and that this timing transgressed the due process requirement that notice and opportunity to be heard "be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). However, we are of the opinion that exchange of trial briefs at the conclusion of trial is a sufficiently meaningful time for purposes of due process analysis. None of Fotomat's authority on this issue suggests otherwise. *See, e. g., Edelberg v. Illinois Racing Board*, 540 F.2d 279, 285 n.9 (7th Cir. 1976), and cases cited therein.

That the delayed exchange of trial briefs procedure is not inconsistent with Rule 5(a), Fed.R.Civ.P., and is not per se violative of due process protections does not mean that we approve of it without reservation. Indeed, we are of the opinion that exchange of trial briefs at the time they are filed with the court is sounder procedure, being one more consistent with the elimination of gamesmanship aspects of litigation and, indeed, with the quest for truth, presumably the ultimate aim of adversarial litigation. Any benefits that a delayed exchange may provide are outweighed by the increased potential for prejudice and by the added difficulties resulting from postponing until after trial the curing of any real prejudice caused by the trial briefs. The district court judge, particularly in the case of a long and complex trial, who has entertained incorrect concepts about some aspects of the case during the course of the trial because of an ex parte brief, is placed in the difficult position of returning to a status quo ante position prior to engaging in the decisional process.

The district court judge in the present case explained his reasons for the procedure on the first day of trial:

> I have to go back and give you the basis for my position in the District for not exchanging briefs. 99 percent of our cases are not cases of this nature, that are well prepared by both sides, and I grew up in that period when we had a lot of counter-punchers practicing law, and they were educated by the opposing party and did little or no work, but they were very adept at using the work of counsel on the other side. That was basically the background of the rule that I have followed on exchange of briefs.

Although we are somewhat sympathetic to the problem for which the delayed exchange procedure was designed, that problem can be mitigated to some degree by merely requiring the parties to submit their briefs for exchange simultaneously. Moreover, we are more concerned with assuring that a party at all times is as well advised of his opponent's arguments as is the trial judge than we are with the problems of the "counterpuncher."

For these reasons under our supervisory power we hereby direct any district court of this circuit which now follows the practice of delayed exchange of trial briefs to require in all future cases each party to serve his trial brief on all other parties at some reasonably short time before or after

he files the brief with the court or provides a copy to the judge.[5]

We find no reason to reverse the district court in the present case on this issue because although we deem more desirable the procedure just announced, the district court's procedure in this case had not been demonstrated to have prejudiced the defendant. The delayed exchange procedure was abandoned early in the trial. Photovest gave Fotomat an edited version of its trial brief on the ninth day of trial, and after a two month recess in the trial, gave it the full, unedited version on the tenth day of trial. As to the first nine days of trial, Fotomat was given the right to call any Photovest witness who had testified during that portion of the trial.[6] During the remaining 21 days of trial, Fotomat did not cite any prejudice from the delay in service. Indeed, in all of its briefs and arguments in this appeal, Fotomat has failed to demonstrate any specific instance of prejudice resulting from the trial brief procedure.

## II. ATTEMPT TO MONOPOLIZE

The district court held that Fotomat violated § 2 of the Sherman Act, 15 U.S.C. § 2, and the Indiana statutory counterpart, Ind. Code 24–1–2–2.[7] Section 2 of the Sherman Act prohibits attempts to monopolize. Generally, a plaintiff claiming that the defendant violated this section must prove specific intent and conduct manifesting that intent to monopolize and a dangerous probability of success in a relevant market.[8] See generally L. Sullivan, Handbook of the Law of Antitrust §§ 50–52 (1977) (hereinafter Sullivan), and cases cited therein. Before discussing the specific intent and dangerous probability of success elements, we will first address the relevant market issue, one which the parties have vigorously contested.

### A. Relevant Market

A definition of the relevant market is essential because "without a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition." Walker Process Equipment, Inc. v. Ford Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). There is some authority for the proposition that in an attempt to monopolize case, as distinguished from a monopolization case, a definition of the relevant market is not necessary. In Lessig v. Tidewater Oil Co., 327 F.2d 459, 474–75 (9th Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046, the court stated that "[w]hen the charge is attempt (or conspiracy) to monopolize, rather than monopolization, the relevant market is 'not in issue.'"[9] The great weight of authority,

---

5. Our authority to direct procedures in the district court derives from our supervisory powers over the district court. In LaBuy v. Howes Leather Co., 352 U.S. 249, 259–60, 77 S.Ct. 309, 315, 1 L.Ed.2d 290 (1957), the United States Supreme Court stated that "supervisory control of the District Courts by the Courts of Appeals is necessary to proper judicial administration in the federal system." This pronouncement has been reaffirmed by every court of appeals that has confronted the issue including our own. See Burton v. United States, 483 F.2d 1182, 1187–88 (9th Cir. 1973), and cases cited therein. See also United States v. Jacobs, 547 F.2d 772 (2d Cir. 1976).

6. At oral argument in this court, Fotomat argued that some of Photovest's witnesses during the first nine days of trial were adverse witnesses. Photovest disputed this assertion contending that it called adverse witnesses later in its case. Regardless of the accuracy of Fotomat's assertion, it failed to indicate anything in

Photovest's trial brief that would have caused prejudice.

7. See notes 27 & 31 infra.

8. A private plaintiff can sue for damages under § 2 if he has been "injured in his business or property." 15 U.S.C. § 15. He can sue for injunctive relief against threatened loss or damage from a § 2 violation. 15 U.S.C. § 26.

9. This follows from the court's rejection of the premise that probability of actual monopolization is an essential element of proof of attempt to monopolize. The court rejected this premise on the theory that "specific intent itself is the only evidence of dangerous probability the statute requires—perhaps on the not unreasonable assumption that the actor is better able than others to judge the practical possibility of achieving his illegal objective." 327 F.2d at 474. See Knutson v. Daily Review, Inc., 548 F.2d 795, 813–14 (9th Cir. 1976), cert. denied,

however, requires a definition of the relevant market. *See, e. g., United States v. Empire Gas Corp.*, 537 F.2d 296, 298–99 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572; *Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs., Inc.*, 531 F.2d 910, 919 (8th Cir. 1976); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir. 1975); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 550 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673; *Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 161–64 (7th Cir. 1972), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two*, 72 Mich.L.Rev. 373, 385 & n.37 (1974). Indeed, one commentator has concluded that the *Lessig* approach "reeks of overkill." Hibner, *Attempts to Monopolize: A Concept in Search of Analysis*, 34 A.B.A. Antitrust L.J. 165, 171 (1967). We are similarly unpersuaded by *Lessig* and thus shall proceed to analyze the relevant market in the present case.

The district court concluded that Fotomat attempted to monopolize "the drive-thru retail photo processing submarket in the Indianapolis metropolitan area." Fotomat argues that the district court erred in defining the submarket and that a proper definition of the relevant submarket is much broader and would include photo processing services offered in drugstores, supermarkets, etc.[10] Under its broader market definition, it argues that its share of the market was insufficient as a matter of law to give rise to any probability that it could succeed in monopolizing that market.

The relevant factors for defining the market in a § 2 Sherman Act case are similar to those used to define the market in a § 7 Clayton Act case. In *United States v. Grinnell Corp.*, 384 U.S. 563, 572–73, 86 S.Ct. 1698, 1704–05, 16 L.Ed.2d 778 (1966), the Court stated that "in § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act (*Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510) there may be submarkets that are separate economic entities," and that "we see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1270–71 (9th Cir. 1975); *L. G. Balfour Co. v. F.T.C.*, 442 F.2d 1, 11 (7th Cir. 1971). Accordingly, the *Brown Shoe* opinion is instructive even though it is a Clayton Act § 7 case involving a product market rather than a service market.[11] The Court stated:

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

370 U.S. at 325, 82 S.Ct. at 1523–24 (footnotes omitted).

---

433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094. *See also* Turner, *Antitrust Policy and the Cellophane Case*, 70 Harv.L.Rev. 281, 305 (1956).

**10.** We note here that although delineating the scope of the relevant market entails analysis of both geographic market and product market, our analysis will address only the latter because the parties do not dispute the geographic delineation used by the district court.

**11.** For purposes of market definition, we shall use product market and service market interchangeably unless indicated otherwise. In most circumstances the same antitrust analysis applies to both. *See, e. g., United States v. Connecticut National Bank*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *International Boxing Club of New York v. United States*, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959).

The market definition problem in the present case is whether *drive-thru* photo processing is, as found by the district court, a relevant submarket. One of the most important indicia suggested in *Brown Shoe* is whether drive-thru photo processing is offered at prices distinct from other methods of photo processing. This is in essence asking whether there is a low level of cross-elasticity of demand between drive-thru and other methods. The concept of cross-elasticity, defined and explained in the margin,[12] first appeared in the case law in *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), where the Court used it to support its conclusion that advertising in other media was not a close enough substitute for newspaper advertising to be included in the same market. High cross-elasticity between two products suggests that they are in the same market.[13]

■ The district court found that:

Retail processing delivered to the amateur photographic consuming public by the drive-thru method has a very low or no significant price cross-elasticity with other methods of retailing processing.

Fotomat contends that this finding is largely unsupported in the record. We cannot agree. The record indicates that Fotomat's prices for photo processing were approximately 20% or more above conventional forms of retailing. Fotomat's Vice-President of Marketing Services testified that Fotomat's print processing prices were over 50% higher than those of most drug store or discount store services. Yet Fotomat was able to grow despite its significantly higher prices. Similar price differentials were found to be very significant in defining the submarket in *Avnet, Inc. v. F.T.C.*, 511 F.2d 70 (7th Cir. 1975), *cert. denied*, 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51. One of the issues in *Avnet* was whether rebuilt or reconditioned used components (auto electrical units such as generators, alternators, etc.) should be included in the same market as comparable new components. This court upheld the F.T.C.'s decision to exclude the used components:

The Commission found that prices for rebuilt or reconditioned used components varied from 25% to 50% below the prices of comparable new items. Moreover, it noted the absence of any substantial interaction in price between the two lines. These factors are sufficient to support the finding that they should be placed in different submarkets.

*Id.* at 77. *See also Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc.*, 516 F.2d 1092, 1100 (7th Cir. 1975), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303. Although Fotomat argues that the record establishes substantial similarity and interaction in prices between drive-thru and other retailers of processing, it has failed to provide any citation to the record in support of this argument, and in our independent review of the record we have not discovered any. Therefore, Fotomat's ability to charge distinctive prices, albeit not determinative of a submarket,[14] is an important factor suggesting that the district court's delineation of a submarket was correct.

**12.** Products that are similar to each other, that are substitutes for each other, display positive cross-elasticity. That is, if the price of *A* remains constant, an increase in the price of *B* will generate more sales of *A* as buyers switch to it. High cross-elasticity means that if the price of *A* remains constant, an $X\%$ increase in the price of *B* will generate a greater than $X\%$ increase in the sales of *A*. *See United States v. DuPont & Co.*, 351 U.S. 377, 400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

**13.** This is not always the case. As Professors Areeda and Turner explained:

Notwithstanding high cross-elasticity between two products at given prices, the producer . . . of one product has market power if he has a significant cost advantage that would persist as he expanded output. [But] since producers with such an advantage will be motivated to cut price and expand their sales, the case will often be taken into account, at least partially, by adjusting market shares to reflect clear trends.

II P. Areeda & D. Turner, Antitrust Law at 371 n. 1 (1978); *see also Sullivan* at 56.

**14.** *See United States v. Continental Can Co.*, 378 U.S. 441, 455, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *Beatrice Foods Co. v. F. T. C.*, 540 F.2d 303, 310 (7th Cir. 1976).

Because a primary aspect of the service at issue, photo processing, is nearly identical whether done by drive-thru kiosks or conventional retailing methods, we might have been inclined to afford the price differential less weight than in other situations where the products appear to be less similar. Our inclination derives from the possibility that the reason for the price differential may be price-insensitive consumers. *Cf. Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20, 28 & n. 22 (3d Cir. 1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). However, since there is no conclusive evidence that consumers in this market are price insensitive, we must afford the price differential its due weight. Moreover, a closer analysis of the products show that although the end product of the drive-thru and the conventional method is nearly identical, the total service is quite different.

The differences in the total service provided by drive-thru as compared to conventional retailing are reflected by industry perception of the drive-thru submarket as a separate economic entity, another *Brown Shoe* factor suggesting a relevant submarket. The district court found that "the drive-thru retail photographic processing business has achieved recognition within the photographic industry as a separate method of doing business and a separate market." More important than industry perception is consumer perception. Expert testimony indicated that consumers do treat drive-thru as a separate submarket. The convenience and service of drive-thru kiosks apparently segregate them from other forms of retailing. Consumers are willing to pay a premium for the convenience of drive-thru service. And the Fotomate, with whom a customer deals, is more of a specialist than salespersons in many drug stores or discount stores that offer photo processing.

Another *Brown Shoe* factor, "specialized vendors," also supports the district court's finding of a drive-thru submarket. It is quite clear that kiosks are a specialized method of retailing distinct from other conventional methods.

Fotomat is disturbed by the district court's finding of a drive-thru submarket in view of the fact that the district court found that a given customer might purchase photo processing from both drive-thru and conventional retailers depending on which is more convenient under the circumstances. Fotomat suggests that this precludes the existence of a submarket. We cannot agree. The law does not require an exclusive class of customers for each relevant submarket. *See, e. g., United States v. Aluminum Company of America,* 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) (the Court recognized a distinction between markets for insulated aluminum and insulated copper wire despite the fact that the same customers bought each for similar purposes). Moreover, in the present case it is significant that at a given time a customer who finds a kiosk convenient will use it regardless of its higher prices.

Recognizing that in defining the relevant submarket the legal "guidelines offer no precise formula for judgment and [that] they necessitate, rather than avoid, careful consideration based on the entire record,"[15] we conclude that the district court properly defined the relevant submarket.

B. *Specific Intent & Conduct*

Having affirmed the district court's delineation of the drive-thru submarket we

---

**15.** *United States v. Continental Can Co.,* 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964). We note also that although in *Brown Shoe* and *DuPont* relatively expansive markets were found to be appropriate, subsequent Supreme Court opinions have recognized narrower markets. Thus, in *International Boxing Club, Inc. v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), the Court held the relevant market to be the promotion of championship boxing contests in contrast to all professional boxing events, despite the claimed physical identity of the products involved. *See also United States v. Connecticut National Bank,* 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc.,* 516 F.2d at 1094.

turn now to the issue of whether Fotomat intended to monopolize the market. Although the case law contains some confusing dicta regarding the need to prove specific intent in an attempt to monopolize case, the Supreme Court has stated that:

> While the completed offense of monopolization under § 2 demands only a general intent to do the act, "for no monopolist monopolizes unconscious of what he is doing," a *specific intent* to destroy competition or build monopoly *is essential* to guilt *for* the *mere attempt* now charged.

*Times-Picayune Publishing Co. v. United States,* 345 U.S. at 626, 73 S.Ct. at 890. *Accord, United States v. Griffith,* 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Although the specific intent requirement has been criticized, *see, e. g.,* Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two,* 72 Mich.L.Rev. at 398–400 (1974); III P. Areeda & D. Turner, Antitrust Law ¶ 822 (1978), and the requisite proof to establish it is not well-settled, the district court found, and the record supports its finding of, the requisite intent, and Fotomat has not argued error in this regard.

Fotomat directs its argument to the district court's finding of predatory conduct and contends that either the finding is not supported by the record or that its conduct was not the sort which is proscribed by the antitrust laws. Photovest's theory, accepted by the district court, was that when Fotomat determined that owning the kiosks was more profitable then franchising them, Fotomat, among other things, saturated the market with company-owned kiosks to reduce severely the profitability of Photovest's kiosks and thereby attempted to reduce substantially the value of Photovest's kiosks so that Fotomat could buy them at a low price. Saturating the market was not

the only method that Fotomat used, according to the district court, to reduce the profitability of Photovest's kiosks. It found that Fotomat engaged in the following conduct in an intentional attempt to do so:

> concealment of discounts available from processors, retention of discounts from processors, the markup of film, the placement of company stores in such a manner as to siphon business from plaintiff, attempts to coerce plaintiff into remaining with Carhart, refusal to relocate losing stores, insistence on escalating rents and a number of miscellaneous found facts. Each of these was designed to reduce plaintiff's profits for purposes of reacquiring plaintiff's stores at the lowest possible price.[16]

Although we will discuss only the primary components of Fotomat's attempt to monopolize, an analysis of these components requires a thorough review of the factual context in which they occurred.[17]

From its inception in 1967, Fotomat intended to "blitz the industry," that is, to preempt the desirable sites for drive-thru kiosks nationally. Because it did not have a vast capital supply with which to do this, it established a franchising arrangement to provide capital and operating management for its rapidly expanding network and to permit simultaneous development of many metropolitan areas. During its initial years of operation, the bulk of Fotomat's revenue was derived from the sale of franchises, not from operations.

By about June 1969, Fotomat concluded that the profits it derived from company-owned kiosks were significantly greater than those it derived from franchised stores. After 1969, no significant franchise sales were made except to fulfill commitments to "block" franchisees who had rights to purchase additional stores. In 1971, a new franchise relations director was em-

---

**16.** Beginning in May 1968, Fotomat's franchise agreements contained a buy-back option by which Fotomat was entitled to repurchase the franchise after three years at a price equal to the greater of $50,000 or 5 times the total net profit for the 12 month period preceding exercise of the option.

**17.** Although this factual discussion is taken primarily from the district court's opinion, we have found that the record supports it.

ployed by Fotomat with instructions to "work himself out of a job."

The franchise arrangement with Photovest began in 1968. The investors who ultimately formed Photovest responded to an advertisement in the Wall Street Journal in which Fotomat solicited the purchase of franchises in several states including Indiana. The Photovest principals made two trips to Fotomat's headquarters in La Jolla, California, where they were given an extensive sales talk. Fotomat represented that each store had a "market area" consisting of the geographic area from which the store drew its customers and that as a general rule no store would be constructed within two miles of any existing store so as not to infringe on the market area of the existing store. It represented that it would select sites for the franchisees based on sophisticated demographic studies which it and others had conducted. It also represented that two stores would not overlap each other's market areas because Fotomat's royalties applied only to receipts of stores in excess of $2,500 per month and thus Fotomat could not afford to have overlapping in market areas. It described a store sales level of $60,000 per year as "modest," $90,000 per year as "satisfactory," $120,000 per year as "above average," and $150,000 per year as "high." Fotomat estimated that the Marion County (Indianapolis) area would support fifteen stores which it identified as the "saturation" level of the area.[18] It told the investors that it would provide the franchisee with essential support services, including daily pickup and delivery of film, customer service, administrative support, kiosk maintenance and complete merchandising support.

On August 26, 1968, Photovest signed a master franchise purchase agreement obligating it to purchase fifteen franchises to operate fifteen Fotomat stores in Marion County, Indiana. Each store was made subject to the standard Fotomat franchise agreement and the standard Fotomat lease agreement which would be separately signed when each store was opened. Photovest agreed to pay $21,000 for each franchise. The price was payment for use of Fotomat's trademark name, a small amount of equipment, original inventory, and miscellaneous items of a value less than $1,000. Photovest also agreed to pay Fotomat as a royalty and continuing franchise fee 12% of the franchisee's gross sales in excess of $2,500 per month. The franchisee was required to pay Fotomat an additional 3% of all gross sales to be "expended by Fotomat for the purpose of advertising, public relations, and the promotion of the total franchise operation."

The agreement expressly required that the franchisee "purchase all merchandise, photo-processing services and other services from Fotomat or from such other sources as have been approved in writing by Fotomat." But Fotomat agreed to sell "all film and film processing" to the franchisee "at Fotomat's cost without any markup whatsoever." If Fotomat itself entered the photo processing business, it could charge the franchisee for its photo processing services, but only at such rates as "shall be comparable to or less than those prevailing in the industry in operator's general market area."

The agreement required Photovest to lease the store from Fotomat at a rent of $375 per month with a cost-of-living escalator effective after five years. Expiration or termination of the lease would terminate the franchise. Fotomat agreed to perform "general services including frequent pickup and delivery of film, frequent delivery of inventory, maintenance of inventories, and regular merchandising services." The term of the franchise was ten years with renewal options for three additional five year periods upon payment of $7,000 per period. Photovest had a right of first refusal which

18. In October 1968, after Photovest purchased the fifteen franchises in Marion County, Fotomat placed an advertisement in the Wall Street Journal soliciting the purchase of franchises in certain midwestern cities. The ad stated that Fotomat was "one of the fastest growing franchise systems in the nation" and that "only a few key franchise areas are still available." The ad prominently displayed the names of various midwestern cities, including Indianapolis, with a line drawn through the name and the notation "sold out."

could be exercised on any additional stores Fotomat offered for sale in Marion County.

### 1. *Saturating the Market*

In 1971, Fotomat's executives in charge of site selection believed that Fotomat had an obligation to the franchisees "to not intentionally pull customers from [the franchisee's] operating stores to ours [company stores] and to act in good faith in the performance of our positioning of the units relative to franchised stores." These beliefs and the understanding or informal policy against "overlaps" of franchised stores were based on Fotomat's knowledge of the basis on which the franchises were sold. As of June 16, 1971, there were eighteen Fotomat stores in the Indianapolis vicinity; fifteen were Photovest's franchised stores, all located in Marion County, and three were company stores located in adjoining counties.

In about 1972, Fotomat began to modify its previous procedures and began to overlap franchised stores on a systematic basis. In 1973, Fotomat devised a "four point program" in response to a Kansas City franchisee's objection to Fotomat's placement of stores in proximity to a franchised store. The program provided that if a store were opened within two miles of a franchised store, the franchisee could either (1) buy a franchise for the store for $21,000 and take a lease at $375.00 per month, (2) choose either unit within six months of the opening of the new unit, (3) sell the franchised unit back to Fotomat "at a negotiated price" (Fotomat represented that the franchisee could choose a unit if, after a sufficient time, it is determined to close one of the units), or (4) do nothing. This four point policy was not disclosed to Photovest until June 1974, when a store was placed in Indianapolis within one and one half miles of one of Photovest's best stores with an annual sales volume of $88,471. Photovest did exercise the option to buy, and that

store became its sixteenth store. It believed at the time that the location was not good, but hoped to deter Fotomat from placing additional overlapping stores in Marion County and purchased to "set a precedent."

In 1974, two other stores were installed within two miles of a Photovest store. Neither was offered to Photovest under the four point program, and when such omission was called to Fotomat's attention, its response was to ignore Photovest's requests. Beginning on October 17, 1974, and up to the date of trial of this case, Fotomat opened ten more stores in and around Marion County. In March 1975, in its next four option offer, Fotomat announced that the price for a franchise store was now $30,000 and the required monthly rental would be $500 per month. It was not economically feasible for Photovest to accept new stores on those terms, a fact which was known to Fotomat. Since March 1974, Fotomat has opened fourteen new stores in the Indianapolis metropolitan area. Twelve of these represent new sites, while two of them are relocations. Over one-half of the new stores since 1973 have physically overlapped existing stores in Marion County, Indiana.

Prior to the effect of the overlaps, three Photovest stores had attained all-time sales highs in excess of $90,000 per year, and two others exceeded $80,000. Although all were growing, by trial Photovest's best store was at $70,576, and like most other stores, was dropping sharply. Photovest's annual sales reached $1,071,670 in the year the overlaps started, and the most recent data available at trial showed its annual sales at approximately $900,000, even with a sixteenth store. As of January 1977, ten of Photovest's stores were below Photovest's overall breakeven point, and five were below the incremental breakeven point of $50,000.[19] By trial, Photovest was incurring substantial losses. It was valued by professional

19. Photovest's breakeven point is $55,000 exclusive of general overhead and $65,000 after all expenses. The incremental breakeven point (i. e. the point at which sales exceed the direct costs of the particular store and begin to contribute to general overhead) is $50,000 for a franchised store. Because a franchised store must pay royalties, advertising fees and rents, which company stores do not pay, the breakeven point of a company store is significantly lower. For example the incremental breakeven point for a company store is $21,000 to $25,000.

business appraisers as worthless and the district court agreed.[20] The district court found that the new company stores were the principal cause of the decline in Photovest's sales. The record supports this finding.

Thus the critical issue in this regard is whether this conduct, albeit destructive of Photovest's profit levels, is proscribed by § 2 of the Sherman Act. Fotomat poses the issue as whether the antitrust laws are violated by locating a store close to a competitor in the hopes of taking some customers from the competitor. It argues that the law does not proscribe such behavior because the antitrust laws specifically encourage competitive store locations and condemn competitors who allocate territories among themselves. It attempts to draw support for its arguments primarily from three cases, none of which we find provides persuasive support. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 611, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

Topco Associates was a cooperative association of regional supermarket chains. Its basic function was to serve as a purchasing agent for its members and to obtain for them high quality merchandise under private labels to make them competitive with larger national and regional chains. The Government sued Topco under § 1 alleging that it combined and conspired with its members to enforce territorial allocation of markets. The territorial allocations effectively insulated members from competition in Topco-brand goods. The Court found the arrangement to be a per se violation of § 1 and was not persuaded to the contrary by the district court's determination that the agreements among members allowed them to compete more effectively with the large supermarket chains. The district court had found for Topco in part because "by limiting the freedom of its individual members to compete with each other, Topco was doing a greater good by fostering competition between members and other large supermarket chains." 405 U.S. at 610, 92 S.Ct. at 1135.

Fotomat argues that the Supreme Court's rejection of this reasoning suggests that the antitrust laws could not proscribe its adding stores in Indianapolis which overlapped the market areas of Photovest franchises.[21] This quantum leap in legal reasoning ignores an important aspect of antitrust analysis. Fotomat's reasoning ignores the whole concept of predatory practices which was not an issue in *Topco.* Many predatory practices promote competition in the short run, but if they are used to effect a monopoly by eliminating competition, they are illegal under the Sherman Act. The enforcement of § 2 of the Sherman Act will often result in a sacrifice of the most competitive conduct in the short run if the ultimate goal of that conduct is the establishment of monopoly power.

**20.** Fotomat argues that the district court's finding that Photovest's franchises were worthless is inconsistent with its finding that sales dropped "a mere 15%" from 1975 to 1977. These findings are not inconsistent since Photovest had relatively high fixed costs and relatively slim profit margins per store. Thus a 15% drop in sales could mark the difference between a profitable enterprise and a bankrupt enterprise. This is also supported by the fact that franchisees would buy blocks of franchises so that a minor drop in the sales at one or two stores could be temporarily absorbed by the other stores in the block.

**21.** Fotomat seems to suggest that if it respected the market areas and did not open overlapping stores, it might be subject to antitrust prohibitions against territorial allocations. But in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 57 n.26, 97 S.Ct. 2549, 2561 n.26, 53 L.Ed.2d 568 (1977), the Court, in rejecting the inherent illegality of territorial allocations, stated:

> We also note that *per se* rules in this area may work to the ultimate detriment of the small businessmen who operate as franchisees. To the extent that a *per se* rule prevents a firm from using the franchise system to achieve efficiencies that it perceives as important to its successful operation, the rule creates an incentive for vertical integration into the distribution system, thereby eliminating to that extent the role of independent businessmen.

In *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 119, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948), the Court sustained district court findings that the defendant "made threats to build theaters or to open closed ones in order to force sales of theaters in various towns or to prevent entry by an independent operator." The Court stated that the district court was justified in drawing the inference of unlawful purpose from this conduct. *Id.*

More recently, the Third Circuit found that there was sufficient evidence from which the jury could have found a § 2 violation, part of that evidence being the defendant's intentional location of a competing factory in the immediate vicinity of the plaintiff's plant. *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 31 (3d Cir. 1978). Each defendant's conduct in *Schine* and *Columbia Metal* may have promoted competition in the short run, but that did not foreclose the possibility of antitrust liability. Fotomat's citation of *Brunswick*[22] and *National Society of Professional Engineers* is unpersuasive for the same reasons.

■ Fotomat also contends that the evidence of record does not support the findings that it expanded in the Indianapolis market for anticompetitive purposes. It relies in great part on the fact that the franchise agreement did not contain a provision prohibiting it from opening new stores which overlapped Photovest's franchised stores. But a party's right to sue for antitrust violations is not dependent on the existence of a contract provision prohibiting the alleged anticompetitive behavior. Moreover, the record in this case clearly supports the district court's findings regarding Fotomat's purpose in locating new stores in Indianapolis. One example of support for this finding is Fotomat's location decisions for its new stores in Indianapolis.

It opened new stores in close proximity to Photovest's best stores. One of Photovest's best stores was devastated by Fotomat's opening of three new stores in its immediate market area. One of these new store's sales never exceeded Fotomat's incremental breakeven point and by trial were well below it. Notwithstanding Fotomat's operations personnel recommendations to remove it, Fotomat did not close it, apparently willing to lose money in the short run hoping to reduce the profitability of Photovest's store for future buy-back. Indeed, after being bracketed by these three new stores, Photovest's store's annual sales of $88,000 dropped 40%. A Fotomat internal memorandum written by an area manager establishes that Fotomat "anticipated" that the new store would "siphon" volume from Photovest's store.[23] Also, it should be remembered that Fotomat's conduct regarding new store locations must be viewed along with its other behavior which in total was found to support a § 2 violation. Otherwise, lawful practices may become unlawful if they are part of an illegal scheme. *See Schine Chain Theatres v. United States*, 334 U.S. at 119, 68 S.Ct. 947.

### 2. Processing Discounts and Film Markups

Another part of the scheme by Fotomat to reduce the profitability of Photovest's stores so that they would eventually be less expensive to buy back was Fotomat's concealment of and retention of discounts it obtained on processing and its markup of Fotomat brand film.

The franchise agreement obliged Fotomat to sell all film and processing to Photovest "at Fotomat's cost without any markup whatsoever." The arrangement between Fotomat and its processors involved processing prices stated in tiers of discounts from the retail price. For example, if the

---

**22.** *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 831–32 & n.14 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486.

**23.** Other indications of Fotomat's purpose in adding numerous stores in Indianapolis include the fact that Fotomat was well aware that "the more profitable the franchise is, the more expensive and difficult it is to reacquire it," and that the franchise relations director was hired "to work himself out of a job."

retail price was $1.00 and Fotomat was given a discount of 47% plus 10%, its wholesale price would be $0.477 ($1.00 ± 47% = $0.53; $0.53 ± 10% = $0.477). Over the years, the second tier discount increased. Fotomat passed on the first tier discount to Photovest but retained the second tier discount. Since the discount terms granted to Fotomat by its processors were highly confidential, Photovest was unaware of Fotomat's retention of the second tier discounts. These discounts ultimately rose to 12% for print and 21.6% for chrome and were secretly retained by Fotomat, as the district court found, both in violation of the contract, and for the purpose of reducing Photovest's profitability.

Similarly, Fotomat introduced private label Fotomat brand film which Fuji and GAF manufactured and sold to Fotomat. Fotomat then sold it to Photovest at prices 7% to 26% above its cost, in violation of the franchise agreement and as part of its scheme to reduce Photovest's profitability.

### 3. The Processing Tie

The master franchise agreement gave Photovest the option to purchase processing from Fotomat or "such other sources as have been approved in writing by Fotomat." But twelve of the individual franchise agreements signed on the opening of new stores from December 30, 1968, through 1971 deleted all reference to "approved sources" and required processing to be purchased from Fotomat. In June 1971, Fotomat informed all franchisees that they could use any processor they wished despite the contract provision.

In the summer of 1974, Photovest began looking for another print processor because of quality problems with Carhart (Fotomat's processor). In September, Photovest informed Fotomat that it intended to switch its print processing to Colorcraft. Fotomat demanded that Photovest also change its chrome processor and perform its own pickup and delivery and customer service, despite the fact that Fotomat was contractually required to provide both pickup and delivery and customer service in return for royalty payments from Photovest. Although Fotomat's refusal to perform pursuant to the contract exerted pressure on Photovest to stay with Carhart, Photovest persisted and ultimately signed a contract with Colorcraft.

The pressure Fotomat exerted on Photovest to stay with Carhart put Photovest in a no-win situation. Either it stayed with Carhart and lost the discounts that Fotomat wrongly retained and suffered the loss in sales resulting from inferior quality processing, or it switched processors and lost the customer service and pickup and delivery services which Fotomat threatened to terminate.[24] Either choice subjected Photovest to an economic loss which contributed to Fotomat's plan to reduce Photovest's profits.[25]

### C. Dangerous Probability of Success

[8] Having agreed with the district court's delineation of the relevant submarket, it is quite clear that there was a dangerous probability that Fotomat would succeed in monopolizing the market.[26] The only related issue worthy of discussion is whether Fotomat's control of the market via buy-

---

**24.** The yearly cost of pickup and delivery in Indianapolis was about $23,000 during 1974, approximately 50% of Photovest's annual profit in 1974. The cost of customer service was $7,000 per year.

**25.** The district court found that one of the contributing factors to Fotomat's attempt to monopolize was its refusal to settle this litigation. It stated: "In sum, this litigation itself has been utilized by defendant as an instrument to drain plaintiff for purposes of ultimately buying plaintiff out at an inadequate price."

We are of the opinion that the district court erred in considering this as a factor. See our discussion of this issue in section V.A., *infra*. Consequently, on remand the district court must reconsider the damage award for the § 2 violation. The award must be reduced by $72,-267 (the $24,089 litigation expenses trebled.).

**26.** Fotomat and Photovest together had 30 of the 39 drive-thru outlets at the conclusion of the trial. Fotomat's regional director estimated Fotomat's and Photovest's aggregate share of sales in 1975 at 95% of the Indianapolis drive-thru market.

back of the Photovest franchises would change the competitive dynamics of the market. Fotomat argues that since Photovest always followed Fotomat's recommended pricing, the buy-back would have no effect on the pricing of the goods or services in the relevant market. It argues that the same amount of photo processing would be done whether Photovest or Fotomat owned the Indianapolis drive-thru kiosks, and that the number of sites preempted by Fotomat stores would remain constant.

We are unpersuaded by this argument because it proceeds on the assumption that Fotomat's pricing behavior is not influenced by the existence of Photovest franchises and thus that if Fotomat succeeded in buying back all the Photovest franchises and obtaining a monopoly, it would not change its pricing policies. Antitrust analysis does not recognize as a defense the possibility that if a defendant obtains a monopoly, he might nevertheless not abuse his monopoly power to extract monopoly profits. The recognition of such a defense in an attempt to monopolize case would devastate the impact of § 2.

The fact that Photovest has always followed Fotomat's suggested prices does not suggest, as Fotomat implies, that the same prices would be charged if Fotomat succeeded in buying back all Photovest stores. The forces of competition may well be restraining Fotomat's recommended prices to its franchisees. The franchisees are not bound to follow these *recommended* prices. Without the restraints of competition, a monopolist often will find that it can maximize profits by selling a lower volume at higher prices than would prevail in a more competitive market. We cannot reverse the district court's finding of a § 2 violation on the ground that Fotomat may not, if given the opportunity, follow the path of many

monopolists. Accordingly, we affirm the district court's conclusion that Fotomat violated § 2 of the Sherman Act.

## III. THE TYING ARRANGEMENTS

The district court found that Fotomat engaged in illegal tying arrangements involving both photo processing and leasing of kiosks. The photo processing tie was held to be in violation of § 1 of the Sherman Act and its state law counterpart, Ind. Code § 24–1–2–1. The lease tie was held to be in violation of only this state statute apparently because of lack of sufficient effect on interstate commerce.[27]

### A. The Photo Processing Tie

The district court held that:

Defendant's securing of plaintiff's agreement to purchase print processing from defendant, by means of the franchise agreements, defendant's concealment of its discounts from processors, and its policies with respect to plaintiff's use of independent processors, constitutes an unlawful restraint of trade in violation of Section 1 [and Ind. Code § 24–1–2–1].

Initially, the tying arrangement was part of the franchise agreement. From 1968 to 1971, twelve of the Photovest franchises included a contractual clause prohibiting Photovest from buying processing from anyone other than Fotomat.[28] Then in June 1971, Fotomat wrote to its franchisees, apparently with knowledge of the then recent opinion in *Siegel v. Chicken Delight, Inc.*, 311 F.Supp. 847 (N.D.Cal.1970), *aff'd in part*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), advising them that they could use any processor they wished despite the provision in their agreements to the contrary. This letter, however, also assured the franchisees that Fotomat was selling processing at its cost without any markup

---

**27.** Ind. Code § 24–1–2–1 is patterned after § 1 of the Sherman Act and Indiana courts have looked to decisional law under § 1 to interpret § 24–1–2–1. *See Orion's Belt, Inc. v. Kayser-Roth Corp.*, 433 F.Supp. 301, 302–03 (S.D.Ind. 1977); *Citizens National Bank of Grant County*

*v. First National Bank in Marion*, 331 N.E.2d 471, 478 n.5 (Ind.App.1975).

**28.** The other four Photovest franchises were subject to clauses which prohibited Photovest from purchasing its processing from anyone else without written approval of Fotomat.

whatsoever. Fotomat then adopted a policy that any franchisee who did switch print processors would have to supply its own pickup and delivery and would have to switch chrome processors. When Photovest decided to switch processors in September 1974, Fotomat responded, consistently with this policy, by demanding that Photovest change its chrome processor and do its own pickup and delivery and customer service.

The district court apparently concluded that an illegal tying arrangement existed from the inception. Although the district court did not analyze the alleged tying conduct in temporal segments, we find it instructive to view the conduct in three segments: (1) prior to the June 1971 Chicken Delight letter; (2) from June 1971 to September 1974; and (3) after September 1974.

In period one, prior to the June 1971 letter, the tying arrangement is clear, at least as to twelve of the sixteen Photovest franchises. These franchise agreements required Photovest to purchase its processing from Fotomat. Thus Fotomat tied the sale of processing to the franchise itself. A tying arrangement is defined as:

> an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, . . . .. They [tying arrangements] are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product . . . ..

*Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The law is well-settled that a franchise license itself can be the tying product. In *Northern v. McGraw-Edison Co.*, 542 F.2d 1336, 1345 (8th Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977), the court stated:

> A franchise license constitutes a separate and distinct marketable item. The weight of judicial authority supports the proposition that if prospective franchisees are compelled to purchase equipment or other tied products in order to obtain the franchise and trademark, an illegal tying arrangement exists.

*Accord, Milsen Co. v. Southland Corp.*, 454 F.2d 363 (7th Cir. 1971); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).

In the present case, Fotomat's considerable economic power in the tying product, the trademark/franchise, was used to restrain competition in the processing market. Competing processors were effectively blocked from competing for Photovest's processing needs, a not insignificant amount of processing.

As to the four Photovest franchises which were permitted to purchase processing from Fotomat-approved sources, the tying arrangement was not established sufficiently. Photovest did not show that Fotomat unreasonably withheld approval. Indeed, it appears that Photovest never submitted a processor to Fotomat for approval during this time period. Photovest contends that the tie was nevertheless sufficiently established because Fotomat did not provide a list of approved processors. This does not in our opinion establish the requisite condition for illegal tying. Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause. "The presence of the illegal condition may be inferred from an extrinsic course of conduct supplementing the written contract," *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 64 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), but in the present case Photovest has failed to provide evidence of any conduct from which to infer the tie. Accordingly, we are of the opinion that the district court erred in including these four franchises in the tying arrangement for the period before June 1971.

In period two, from June 1971 to September 1974, we are again unable to agree with

the district court's finding of a tying arrangement. Photovest's theory, which persuaded the district court, was that notwithstanding the "Chicken Delight" letter of June 1971, Fotomat's fraudulent representation to Photovest that it was offering processing at its cost without markup, induced Photovest to continue to purchase its processing from Fotomat's processor (Carhart). When Fotomat informed its franchisees that they could purchase processing from whomever they wished, it also assured them that it was offering them processing at its cost. Photovest argues that it had no reason to look elsewhere for processing since it assumed it was receiving its processing at Fotomat's cost and that Fotomat had substantial buying power. From this premise, Photovest concludes that Fotomat tied its processing to its trademark/franchise. It is at this step in the reasoning that Photovest's argument fails.

In essence, using Photovest's reasoning, we would find an illegal tying arrangement whenever a franchisor tells a franchisee, "You can buy your supplies from whomever you desire, but my prices are lower" (knowing that its prices are not lower). This cannot constitute an illegal tie because a tying arrangement requires that the defendant use his economic power in the tying product to coerce the plaintiff to purchase the tied product on terms the plaintiff would not otherwise accept but for his desire to obtain the tying product. *See, e. g., Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 377 (5th Cir. 1977); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1326–31 (5th Cir. 1976). Photovest did not purchase processing from Fotomat because of Fotomat's power over the trademark/franchise. Rather it purchased from Fotomat because of Fotomat's untruthful representation that Fotomat was selling at cost. Fotomat's untruthful representation may constitute breach of contract or fraud or other state law violations, but it cannot constitute the missing link in an illegal tying arrangement.

Photovest cites *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55 (4th Cir. 1969), *cert. denied* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), in support of its tying theory which appears to be a tying by lying theory. SCM manufactured and sold office copying machines and the paper and other supplies used with the machines. The plaintiff was a distributor of paper and supplies for copying machines, but distributed a different brand of paper and supplies. The court held that SCM tied its paper and supplies to its service contracts. Its service contract stated, "Because SCM photocopy machines are designed to give excellent performance with SCM photocopy supplies, . . . SCM reserves the right to suspend this agreement as to any machines in which other suppliers' paper or other supplies have been used. . . . [and] [t]his agreement shall not apply to any repairs made necessary by the use . . . [of] supplies made by other than SCM and not approved by SCM for use in SCM equipment." *Id.* at 65. SCM never approved any competitive paper for use in its machines even though it knew that the plaintiff's paper was safe and as effective as SCM paper for such use. Moreover, SCM representatives deliberately misrepresented to customers that use of plaintiff's supplies "would cause service calls and interrupt the continuous operation of their machines," and threatened cancellation of rental agreements with customers who used non-SCM supplies in their SCM machines. The court held that both the restrictive contract language and the conduct designed to enforce the illegal restrictions violated the Sherman Act. *Id.* at 66.

From this holding, Photovest tries to distill a rule that fraudulent inducements to purchase made by a defendant with market power in one product will entail an illegal tie. This goes too far. *SCM Corp.* is distinguishable from the present case because SCM threatened, both by contract and by conduct, to terminate its customers' access to the tying product (either the service and maintenance of SCM copiers or the rental or lease of the copiers themselves) if the customers failed to use the tied product

(SCM paper and supplies). The fraudulent misrepresentations were used merely to justify to its customers its enforcement of the tie. In the present case, however, the fraudulent misrepresentations stood alone; they were unaccompanied by either contract language or conduct which was invoked to enforce a tie. Fotomat did not threaten to terminate the franchise if Photovest refused to use Fotomat's processor. It merely misrepresented the value to Photovest of using that processor. Indeed, the fraud was not linked in any significant way with the tying product.

The principal evils of tying arrangements are the foreclosure of competitors in the tied product market and the denial to buyers of the advantages of marketplace shopping. *See Northern Pacific Ry. Co. v. United States*, 356 U.S. at 6, 78 S.Ct. 514. These evils do not arise in the present case because competitors in the processing market were free to lure Photovest's business by offering their services at lower prices than Carhart, and Photovest was free to solicit such bids. That these parties failed to do so may be attributable to poor business judgments or to torpid competitors in the processing market, or even to Fotomat's fraudulent misrepresentations, but not to Photovest's fear of losing the tying product (the franchise or whatever else might be characterized as the tying product). Accordingly, we are of the opinion that the district court erred in finding an illegal tying arrangement during this period.

■ In period three, after September 1974, we agree with the district court that Fotomat engaged in an illegal tying arrangement. It was during this period that Photovest informed Fotomat that it was switching print processors. Fotomat's response, including its demand that Photovest

switch chrome processors and that it perform its own pickup and delivery and customer service, constituted the illegal tie.[29] It tied its print processing to its contractual duties to perform specific and costly services. Since Photovest could not obtain the tied services elsewhere (free of charge) Fotomat had appreciable economic power in the tying product. We also note that Fotomat's pressures to induce Photovest to purchase processing only from its processor were not grounded on quality control considerations. *See Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d at 376.

The damages computed by the district court on these tying claims under counts I and III must be recomputed on remand consistent with foregoing portion of this opinion.

**B.** *The Lease Tie*

■ The district court held that the contractual requirement that Photovest lease its kiosks from Fotomat constituted an illegal tying arrangement. The franchise agreements stated: "As an express condition of this agreement, Operator must continue as a lessee of a Fotomat Merchandising Island. Operator hereby agrees that the lease executed between Fotomat and Operator contemporaneously with this Agreement is pertinent to this Agreement and expiration or termination of the lease, in accordance with its terms, shall have the effect of terminating this Franchise Agreement." Photovest paid $375 per month for each kiosk and land until 1973 when the contractual rental escalator permitted Fotomat to raise the rent to $500 per month which it did. The district court found that there was no operational reason why Photo-

29. Photovest contends that Fotomat's conduct in response to Photovest's desire to switch processors was a consistent policy that Fotomat had developed since June 1971. However, Photovest was unaware of this alleged policy until period three. Thus this policy cannot be used to extend the tying violation into period two.

Even if there were sufficient evidence that during period two Fotomat would have responded to Photovest's attempt to change processors in the same manner as Fotomat responded after September 1974, we would not extend the tying violation to include period two because Photovest could not have proved that it was coerced to stay with Carhart because of its desire to receive the tying product (the pickup and delivery services, etc.) since it was totally unaware that the tying product was conditioned on staying with Carhart.

vest could not have either constructed its own kiosks or purchased them outright from Fotomat. It found that Photovest was capable of locating suitable sites and negotiating ground leases had it been permitted to do so under the franchise agreements. It also found that Photovest incurred no damages from the leasing requirement until Fotomat raised the rent to $500.

The tying arrangement here is quite clear. The express language in the franchise agreement setting forth the condition constitutes a prima facie case. *See, e. g., Schuler v. Better Equipment Launder Center, Inc.*, 74 F.R.D. 85 (D.Mass.1977). A tie involving real estate is just as unlawful as any other tie. *See Carpa v. Ward Foods, Inc.*, 536 F.2d 39, 50–51 (5th Cir. 1976); *Milsen Co. v. Southland Corp.*, 454 F.2d 363, 365 (7th Cir. 1971).

Fotomat argues that the lease tie was rebutted by the facts that Photovest desired to purchase a "turn-key operation," a complete package including land and kiosks, and that Photovest never sought to lease land on its own. These facts, however, do not rebut the proposition that Photovest was coerced by Fotomat's appreciable market power in the franchise to accept the leasing provision. That Photovest desired a complete package does not alter the proposition that were it not for its desire to obtain and retain the franchise it would not have agreed to the leasing provision. Indeed, Fotomat could have offered a "complete package" without conditioning the franchise on the leasing arrangement. It could have made the leasing arrangement optional. The fact that Photovest never

sought to lease land on its own is rather obviously the result of the restrictive contract and the fact that Photovest valued the franchise and did not choose to jeopardize the franchise by violating the lease clause. Furthermore, Fotomat offers no evidence to indicate that during the time period for which the district court computed damages Photovest was uncoerced. Fotomat directed its argument only to the time at which the parties entered the franchise agreement.

Fotomat's final argument regarding the tying arrangements deserves little attention. It argues that it lacked any appreciable economic power in the tying product, the trademark/franchise, to permit it to effect an illegal tie.[30] The record shows that in 1968 Fotomat was the only national franchisor of drive-thru photo processing. Its national advertising and the "billboard" effect of its forecasted 5000 stores were substantial advantages. This, in our opinion, shows the requisite economic power in the trademark/franchise. We, accordingly, affirm the judgment as to this issue.

## IV. COMBINATION AND CONSPIRACY TO RESTRAIN TRADE

The district court concluded that since March 1972, Fotomat has engaged "in an unlawful combination and conspiracy with its wholly owned subsidiary, Fotomat Labs, Inc., designed to eliminate plaintiff as a retail competitor of defendant and as an independent purchaser of photo processing in violation of Section 1 of the Sherman Act. . . ."[31]

---

**30.** The Supreme Court has explained that for purposes of tying arrangements, "appreciable restraint results whenever the seller can exert some power over some of the buyers in the market, even if his power is not complete over them . . . ." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 503–04, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969).

**31.** The district court also held this same conduct violative of Ind. Code § 24–1–2–1. It further held that Fotomat violated § 24–1–2–1 since June 1971, before Labs was on the scene, by engaging in an unlawful scheme and design

having the same purpose. The district court apparently was of the opinion that two actors, as required by § 1 of the Sherman Act, were not necessary under § 24–1–2–1. Subsequent to the district court's opinion in this case, the Chief Judge of that district issued an opinion, with which we agree, that states that the Indiana statute does not extend beyond the bounds of federal antitrust law. *Orion's Belt, Inc. v. Kayser-Roth Corp.*, 433 F.Supp. 301, 302–03 (S.D.Ind.1977). Accordingly, the district court in the present case erred in finding a violation of § 24–1–2–1 before March 1972.

Fotomat Labs, Inc. (Labs) was incorporated in 1971 as a wholly owned subsidiary of Fotomat. In March 1972, Labs acquired 50% of a joint venture with a subsidiary of Carhart (the independent Indianapolis processor based in New York from which Fotomat purchased print processing) to operate the Indianapolis plant. This joint venture lasted until May 1974 when Carhart again owned the plant independently. By 1974 Labs' wholly owned plants were doing much of Fotomat's print processing throughout the country.

Carhart performed Fotomat's Indianapolis processing from 1968 to February 1972. From February 1972 to May 1974, the joint venture performed the processing. Then from May 1974 to May 1976, Fotomat again used Carhart. It then switched to the Labs plant in St. Louis. In 1974, Photovest switched its processing to Colorcraft, an independent print processor in Louisville.

The object of the Fotomat-Labs conspiracy, as described by Photovest, was as follows:

> Fotomat receives roughly twice the profits from a retail outlet that uses Labs rather than an outside processor. . . [O]ne of the reasons both Fotomat and Labs sought first to deceive and then to coerce Photovest into remaining with Carhart was keep Photovest "within the Fotomat system" . . . so it could be converted to Labs as soon Fotomat's contractual commitment to Carhart expired. . . . Fotomat's objective was ultimately to acquire Photovest and thereby obtain for Labs Photovest's volume as a consumer of wholesale processing.

A scheme to force independent dealers out of business pursuant to a plan of vertical integration, if effected through combination or conspiracy, is a § 1 violation. See Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1347 (3d Cir. 1975). Photovest argues that the Fotomat-Labs plan was just that.

Fotomat attacks this § 1 violation on several fronts. First, it contends that Labs was not separate, distinct, or independent from Fotomat and thus a conspiracy could not have existed with only one member. The problem of intra-enterprise conspiracy often presents difficult issues in defining an economic unit. The Supreme Court has held that two separately incorporated subsidiaries within the same corporate family can conspire. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951) ("common ownership and control does not liberate [them] from the impact of the antitrust laws."). Accord Perma Life Mufflers v. International Parts Corp., 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). Separate incorporation, however, albeit an important factor, is not conclusive proof of the requisite two actors for a § 1 conspiracy. Knutson v. Daily Review, Inc., 548 F.2d 795, 801–02 (9th Cir. 1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094. Thus we must decide each case on its particular facts. Some relevant factors to consider include "the extent of the integration of ownership, whether the two corporations have separate managerial staffs, . . . the extent to which significant efficiencies would be sacrificed if they were required to act as two firms, their history, whether they functioned as separate firms before being partially integrated, and finally, the extent to which they may, acting as one, wield market power which they would not possess if viewed as separate firms." Sullivan at 328.

The evidence in the present case shows that Labs was separately incorporated to minimize potential for labor relations friction which might arise from the disparity in benefits between employees of photo processing labs and existing Fotomat personnel. The executive management of Fotomat overlapped that of Labs. Moreover, Labs did not maintain separate corporate offices. Profit-related compensation for Labs personnel was calculated solely in terms of the profitability of Fotomat rather than in terms of an appraisal of Labs' independent net income. For all external purposes, financial statements and tax return

data were consolidated. In publicly circulated financial statements, all subsidiaries of Fotomat were lumped together with the parent and referred to simply as "the Company." Historically, Labs was formed to integrate photo processing services into Fotomat owned processing facilities and never existed for the independent purpose of establishing a processing business to service non-Fotomat customers. It acted merely as the processing arm of the enterprise.

In response to this substantial evidence that Fotomat and Labs were not separate entities for antitrust purposes, Photovest offers only two statements, one by Fotomat's in-house counsel in which he said that Labs has independent personnel, laboratories, machinery, equipment, and costs and that it bills Fotomat just as independent processors do, and another by Fotomat's president in which he said that Labs "was a separate business and we elected to treat it as such." The fact that Labs billed Fotomat for processing and had separate costs, machinery, equipment, etc., is not very significant other than as evidence that separate accounting made for internal accounting clarity. And the isolated statement by Fotomat's president cannot be given great weight.

We would be more comfortable in deciding this issue if we had a more thorough record in this regard. It is rather curious that the record is extremely thorough, in fact overwhelming, in almost every other aspect of this case. Nevertheless, on the basis of the record before us, we are of the opinion that for antitrust purposes, Fotomat and Labs were really one entity and thus could not have conspired in violation of § 1. The fact that Labs was separately incorporated and the statements of Fotomat's president and in-house counsel are not sufficient to overcome the more sub-

stantial evidence indicating that Labs was merely a service arm of Fotomat, more like a corporate division than a separate corporate entity. To find the two actors necessary for a § 1 conspiracy in this case would not be significantly different from holding, contrary to good authority, that a corporation can conspire in violation of § 1 with its wholly-owned, unincorporated sales division, *see H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 244 (5th Cir. 1978), and we do not intend in the present case to lead a movement toward a single-firm conspiracy doctrine.[32] Accordingly, we reverse the district court's finding of a § 1 conspiracy to restrain trade on the ground that Fotomat and Labs were not two separate economic entities for purposes of § 1 conspiracy analysis.[33] Likewise, for the reasons stated in note 31, we reverse the judgment on this issue as raised under state law.

## V. STATE LAW CONTRACT CLAIMS

The district court held that Fotomat breached several provisions of the franchise agreements, but the significant issues on appeal involve the district court's holding that Fotomat breached an implied covenant of good faith and fair dealing; that Fotomat's multiple breaches of contract constituted "an oppressive, intentional, tortious wrong" requiring punitive damages; and that Fotomat's representations to Photovest since May 1970 concerning the nature and amount of its processor discounts constituted fraud for which punitive damages were appropriate.

### A. *Implied Covenant of Good Faith*

 Applying California law, the district court concluded that Fotomat breached an implied covenant of good faith and fair dealing by:

---

**32.** Commentators have not called for the expansion of the intra-enterprise conspiracy doctrine. One respected commentator has referred to the doctrine as "one of the wierdest concepts ever to rear its head in antitrust jurisprudence." Handler, *Some Misadventures in Antitrust Policymaking—Nineteenth Annual Review*, 76 Yale L.J. 92, 119 (1966).

**33.** Since we have decided that Fotomat and Labs were not two economic entities for § 1 purposes, we need not reach the issue of whether their conduct was sufficient to establish an agreement or conspiracy. However, we note that the evidence in this regard is very thin.

(a) its saturation of the Marion County market with company-owned stores, including the placement of numerous company stores in the market areas of franchised stores as found; (b) its refusal to relocate losing plaintiff's stores and its imposition of onerous terms upon relocations; (c) its reduction in services to plaintiff, and its efforts to transfer expenses to the franchisees as found; (d) its efforts to prevent plaintiff from changing print processors and thereby obtain better processing at lower cost as found; (e) forcing plaintiff to bring this action to obtain rights it clearly has as found; and (f) its efforts through all of the above to destroy plaintiff's business and to recover the franchise for itself as found.

The covenant of good faith and fair dealing, according to the district court, is implied by California law in every contract and imposes a duty on each party to do nothing to destroy the right of the other party to enjoy the fruits of the contract and to do everything that the contract presupposes they will do to accomplish its purpose. Under the district court's interpretation of California law, the implied covenant prohibited actions by Fotomat that would preclude profitable operation of the franchise or coerce franchise owners to terminate their agreements on terms favorable to Fotomat. Fotomat argues that the covenant of good faith doctrine is essentially a rationalization for imposing otherwise unfamiliar duties on insurers, and that in a non-insurance context, the doctrine must be applied only in very narrow circumstances not present here. It is quite clear that California courts have not restricted the doctrine to insurance cases. *See, e. g., Schoolcraft v. Ross,* 81 Cal.App.3d 75, 146 Cal.Rptr. 57, 59 (1978) (deed of trust); *Osborne v. Cal-Am Financial Corp.,* 80 Cal.App.3d 259, 145 Cal.Rptr. 584, 589 (1978) (real estate contract); *Ohashi v. Verit Industries,* 536 F.2d 849, 853 (9th Cir. 1976), *cert. denied,* 429 U.S. 1004, 97 S.Ct. 538, 40 L.Ed.2d 616 (stock transfer agreement). Indeed, the doctrine has been applied to franchise agreements. *Dayton Time Lock Service, Inc. v. Silent Watchman Corp.,* 52 Cal.App.3d 1, 124 Cal.Rptr. 678,

683 (1975). Thus Fotomat's suggestion as to the limited scope of application of the doctrine is not persuasive.

As to its suggestion that in a non-insurance context, the doctrine must be applied only in very narrow circumstances not present here, it cites *Hinckley v. Bechtel Corp.,* 41 Cal.App.3d 206, 116 Cal.Rptr. 33 (1974), as its only authority. In that case, an employee of the defendant was covered by a group life insurance program under which he had a right to convert it into an individual policy without evidence of insurability within thirty days after termination of employment. He failed to exercise that option after he retired, and when he died over a year later, his administratrix sued the defendant for breach of employment contract for the value of the group life policy. Because the language of the policy clearly prohibited recovery, the court explored but rejected the possibility of implying a term or covenant in the employment contract to allow recovery. It would have had to imply a term which would have required the employer to give special notice to its employees of the conversion right under the policy. In refusing to imply such a term the court stated that "It must be especially emphasized that appellant does not allege that it was clearly within the contemplation of the parties that Bechtel [employer] should give special notice to its employees of the conversion right . . ." 116 Cal.Rptr. at 36.

In contrast, in the present case, Photovest argued specifically that Fotomat's actions violated representations it made that were clearly within the contemplation of the parties. Moreover, Fotomat's reliance on *Bechtel* is unpersuasive because *Bechtel* addressed a request to imply a specific provision rather than a general covenant of good faith and fair dealing which is what the district court in the present case did.

■ Although we affirm generally the district court's holding regarding the breach of covenant of good faith and fair dealing, we disagree with one aspect of that holding. One of the means by which Fotomat was

held to have breached that covenant was by "forcing plaintiff to bring this action to obtain rights it clearly has. . . ." In other words, Fotomat's refusal to settle and its concomitant decision to defend in this litigation contributed to Fotomat's breach of the covenant. Photovest has not provided nor have we found any authority to support the district court in this regard. The only cases offered in support by Photovest are cases which involve antitrust or other injury resulting from instituting a pattern of baseless litigation. Nothing in the case law suggests that liability may stem from the *defense* of a lawsuit or from the decision to defend rather than settle. Such a rule would infringe basic rights in our system of jurisprudence.

> Under our jurisprudence the defendant may present any defense to such an action that he may have or that he may deem expedient, and in so doing he will not be subjecting himself to a second suit by the plaintiff based on the wrongful conduct of the defendant in causing the plaintiff to sue him or in defending the action. The rule is the same even though the wrongful conduct of the defendant is willful, intentional, malicious or fraudulent.

*Ritter v. Ritter,* 381 Ill. 549, 46 N.E.2d 41, 44 (1943). We, therefore, reverse the district court's award of $24,089 damages for litigation expenses as part of its damage award for breach of implied covenant of good faith and fair dealing.[34]

Fotomat has also argued, albeit briefly, that the record does not support the findings on which the district court based its conclusion that Fotomat breached an implied covenant of good faith and fair dealing. We have reviewed the record in this regard and must flatly disagree.

**B. *Tortious Breach of Contract***

The district court held that Fotomat's "multiple breaches of its contract with Photovest constitute under Indiana law an oppressive, intentional, tortious wrong for which punitive damages are appropriate.[35] The court would reach the same conclusion under California law."[36] It also concluded that the awarding of punitive damages was in the public interest.

Fotomat argues that neither Indiana nor California law recognizes tort liability for oppressive breach of contract. The seminal case in Indiana is *Vernon Fire & Casualty Insurance Co. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173 (1976). In that case the Indiana Supreme Court, after first acknowledging the general rule that punitive damages are not appropriate for breach of contract, discussed exceptions to that rule. It explained that punitive damages may be awarded if the conduct of the breaching party "not only amounts to a breach of the contract, but also *independently* establishes the elements of a common-law tort such as fraud." *Id.* at 180. It also explained that punitive damages could be awarded in the absence of an independent tort if "it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a pre-determined tort . . . [and] *that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated."* *Id.* (emphasis in original).

It is, therefore, clear under Indiana law that in the proper circumstances punitive damages may be awarded on a tort theory in a breach of contract case. Although

---

**34.** For the same reasons, we reverse the litigation expenses damage component awarded under other counts.

**35.** Although this statement might be interpreted to mean that the tort liability arose from the numerosity of breaches rather than from the substance of the breaches, it is clear from the context and from the allegations in the count which the court was addressing that the num-

ber of breaches alone was not the basis for the tort liability.

**36.** Although the court and the parties agreed that California law applied for contract breach purposes, the court apparently applied Indiana law regarding tortious breach of contract because the tort occurred in Indiana. The parties have not contested this.

Fotomat has contested the propriety of mixing tort liability into a breach of contract setting a practice which we ourselves view as questionable, we are compelled to follow the state law as articulated by the Indiana Supreme Court in *Vernon Fire & Casualty Insurance Co.* In doing so, we note that Fotomat has offered no persuasive reasons why its conduct did not satisfy the requirements set forth in that case. Thus, we affirm the district court's decision that punitive damages are *appropriate.*[37]

We cannot, however, affirm the district court's award of an equal amount of actual damages for tortious breach of contract.[38] *Vernon Fire & Casualty Insurance Co.* does not permit the tortious breach of contract theory to be used as a means to recover actual damages. It very clearly articulated this theory as a justification only for awarding punitive damages. *See Hibschman Pontiac, Inc. v. Batchelor,* 266 Ind. 310, 362 N.E.2d 845, 847 (Ind.1977). We, therefore, reverse the district court's award of *actual* damages for tortious breach of contract.[39]

### C. *Fraud*

 The district court held that Fotomat's representations to Photovest since May 1970 concerning the nature and amount of its processor discounts constituted fraud under both Indiana and California law. The elements of actionable fraud are: (1) false representation of material fact; (2)

knowledge of falsity or lack of reasonable ground for believing the matter asserted to be true; (3) intent to induce reliance thereon; (4) justifiable reliance by the plaintiff; and (5) resulting damage. *Auto Owners (Mutual) Insurance Co. v. Stanley,* 262 F.Supp. 1, 4 (N.D.Ind.1967); *Vasquez v. Superior Court,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, 970 (1971). Fotomat's only significant argument is that Photovest did not satisfy the fourth element because its reliance on Fotomat's misrepresentations were not justifiable. It argues that the record proves that Photovest had knowledge of the fraud since March 1970 and thus it could not have justifiably relied on the misrepresentations. Our review of the record, however, indicates that the few amorphous bits of information that Photovest may have been aware of were insufficient to provide grounds for it reasonably to be able to construct even a rough idea of the full scope and substance of the fraud.[40] Accordingly, its reliance on Fotomat's fraudulent misrepresentations were justifiable. We, therefore, affirm the district court's decision regarding fraud.

### VI. DAMAGES

Calculation of Photovest's damages in this case was a very complicated task for the district court, because the case involved several different legal theories with overlapping damages and variations in the statutory periods of limitation. Our disposition of the numerous issues in this appeal has

---

**37.** Although the district court held that punitive damages were appropriate, it concluded that: "Because the court holds that defendant has violated Indiana Code 24–1–2–1 and 24–1–2–2, which are Indiana criminal statutes, plaintiff may not under Indiana law recover the punitive damages to which it would otherwise be entitled for activity by defendant which violates those criminal statutes."

Because the conduct which supported the punitive damages was in essence the same conduct which contributed to the antitrust treble damage liability, it would be inappropriate under Indiana law to award punitive damages in addition to the punitive aspects of the treble damage award. *See Taber v. Hutson,* 5 Ind. 322, 325 (1854); *Glissman v. Rutt,* 372 N.E.2d 1188, 1190 (Ind.App.1978).

**38.** The district court stated that Fotomat's tortious breaches of contract constituted a basis for actual damages of $894,046.76 and for an equal amount of punitive damages.

**39.** To eliminate any confusion, our holding does not disturb the district court's award of compensatory damages for normal, as distinct from tortious, breaches of contract regarding film markups, processing discounts, etc.

**40.** We do not suggest that a plaintiff with knowledge of the fraud may nevertheless claim justifiable reliance just because it does not know the exact dollar amount involved or every intricate detail of the fraud. But that is not the case here.

included reversals of some aspects of the district court's decision. On remand, this will require the district court to recalculate damages, but the total damages awarded will not be drastically altered because the bulk of the damages awarded for attempt to monopolize have been affirmed; and damages awarded under theories that have now been reversed were for the most part duplicated in the attempt to monopolize award.

We direct the district court on remand to reassess and recalculate damages consistent with this opinion and, for greater clarity, to list the damage awards under the various counts and indicate what portion of each is duplicative of damages under another count so that the total damages may be computed by adding the non-duplicative amount of each count. We do not suggest that this procedure is required in all similar cases, but when a complex damage award, as in this case, is involved, this procedure will facilitate any subsequent review that may occur. We also do not suggest that the district court did not provide an adequate basis for the damage award. *See Allen v. W.H.O. Alfalfa Milling Co.,* 272 F.2d 98, 100 (10th Cir. 1959). The district court entered damage findings as to each count and made subsidiary findings stating the amount of the components of each award. Moreover, Fotomat's contention that the damage findings are replete with internal conflicts has not been persuasively supported.

## VII. FACT FINDINGS

Fotomat argues that the district court's findings were adopted almost verbatim from findings submitted by Photovest, and thus that we should scrutinize those findings more critically. This court has criticized the practice of adopting the prevailing party's findings without change and has admonished the district courts to "exer-

cise an astucious editorial pen on counsel-submitted findings." *FS Services, Inc. v. Custom Farm Services, Inc.,* 471 F.2d 671, 676 (7th Cir. 1972). We are of the opinion that findings which have been adopted wholesale from those submitted by the prevailing party should be examined more critically to determine whether they are clearly erroneous.

The present case is not an egregious example of undeviating adoption of the prevailing party's findings. The district court rejected all or most of 86 of Photovest's numerous proposed findings, reorganized findings it did accept, and edited others of them. Because it did adopt with little change the bulk of Photovest's findings, however, we have critically reviewed the contested findings and examined the record to insure that it contained the requisite support. As a result, we conclude that except where we have stated otherwise, the findings are not clearly erroneous.

For the reasons stated throughout this opinion, the judgment of the district court is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. As we have noted, despite some reversals, the total damages awarded will not be drastically altered. Accordingly, costs in the judgment of this court will be assessed against the defendant.[41]

---

41. Pursuant to Circuit Rule 16(e), that part of the foregoing opinion captioned "I. EXCHANGE OF BRIEFS PROCEDURE" has been circulated among all judges of this court in regular active service. No judge favored a rehearing *en banc* on the question presented by the direction that any district court of this circuit now following the practice of delayed exchange of trial briefs should require in all future cases each party to serve his trial brief on all other parties at some reasonably short time before or after he files the brief with the court or provides a copy to the judge.