COALITION OF BEDFORD–STUYVES-
ANT BLOCK ASSOCIATION,
INC., Plaintiff,

v.

Mario CUOMO, Governor of the State of New York, Edward I. Koch, Mayor of the City of New York, Harvey Robins, Commissioner of the New York City Human Resources Administration, Hadley W. Gold, Esq., Commissioner of the New York City Department of General Services, and Paul Crotty, Commissioner of the New York City Department of Housing Preservation and Development, Defendants.

No. 86 Civ. 3766.

United States District Court,
E.D. New York.

Jan. 15, 1987.

Jose A. Rivera, P.C., Brooklyn, N.Y., for plaintiff.

Frederick A.O. Schwarz, Jr., Corp. Counsel of City of New York, New York City, for defendants; Frederick P. Schaffer, George Gutwirth, of counsel.

BARTELS, District Judge.

This controversy is the latest of many suits against the City of New York ("City"), challenging the City's attempts to comply with its legal and moral obligation to supply shelters for the homeless, practically all of which were rejected. The plaintiff is the Coalition of Bedford-Stuyvesant Block Associations, Inc., a non-profit corporation consisting of some 40 unnamed individuals and 38 unspecified block associations that apparently are located in Brooklyn Community District numbers 1, 2, 3, 4, 5, 8 and 16. All named defendants are City officials sued in their official capacities save one, Governor Cuomo, who, although named, is not a party to this suit.

The action was initiated on November 7, 1986, by plaintiff's application for a preliminary injunction, which was consolidated with a trial on the merits. A five-day bench trial was subsequently commenced on December 1, 1986, during which the Court heard testimony from ten witnesses and admitted numerous exhibits into evidence.

Plaintiff's claims are predicated upon the alleged intentional discrimination against black and hispanic residents of the aforementioned community districts including, in particular, those comprising the Bedford-Stuyvesant area of Brooklyn, in connection with placing an additional shelter for the homeless in the Sumner Avenue Armory.

Specifically, plaintiff alleges that as part of a pattern and policy of racial discrimination against plaintiff and others similarly situated, defendants purposely and willfully concentrate site selection and placement practices with respect to shelters for homeless persons in minority communities, *i.e.,* black and hispanic. Plaintiff further alleges that in the Borough of Brooklyn the defendants' discriminatory practices have had the effect of concentrating all, except one, City owned and operated singles shelter for the homeless in that part of Brooklyn comprising generally minority community board areas 1, 2, 3, 4, 5, 8 and 16. Such discrimination, it is alleged, violates plaintiff's rights under the Fourteenth Amendment, 42 U.S.C. §§ 1981, 1983, and 2000d *et seq.,* 3601 *et seq.,* Articles I and II of the New York State Constitution, and Article 15, § 296 of New York's Executive Law (McKinney's 1982 & Supp.1987).

Plaintiff seeks to permanently enjoin the City from taking any action "to build, construct, or place any persons within those shelters located in North and Central Brooklyn," or in the aforesaid community districts and, in particular, the Sumner Avenue Armory. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(3) & (4) and 42 U.S.C. § 3612. The undisputed facts follow.

### FACTS

*Brooklyn*

There are 18 community districts in Brooklyn, of which 8 have a white majority population. Overall, the population of Brooklyn is 2,230,794 persons, consisting of 48.6% white, 30.9% black, 17.6% hispanic, and 2.9% others. Brooklyn has only six shelters for homeless individuals, sheltering about 4,910 homeless persons, which consists of about 20% of the total number of homeless in the City. Of these six shelters, four are located in community districts with few whites and one is located in a white majority district. However, the second largest shelter in Brooklyn, which is in Greenpoint, shelters 31.4% of Brooklyn's homeless individuals and has a 48.5% white population.

Two of the City's 5 family shelters are in Brooklyn, which also hosts one of the City's five family centers, and several hotels currently employed by the City as temporary family accommodations.

*City-wide*

The city-wide population is 7,068,066. Manhattan has a total population of 1,420,-692 persons, hosts nine shelters for homeless individuals, and shelters about 14,149 persons out of a total of about 23,814 homeless. Considering shelter sites on a city-wide basis, including Manhattan, we find that 38 of the City's 59 districts contain either shelter sites for homeless individuals, homeless families, or both. Of these 38 districts, 16 districts have a white majority and half of these 38 districts have a population which is at least 40% white. The largest "singles" shelter in the system is Bellevue, sheltering 1,016 individuals, and located in Manhattan Community District 6, which district is 84.2% white.

With respect to the distribution of homeless families on a city-wide basis, 16 of the 25 districts where such families are sheltered have a population of at least 40% white, 12 have a population of over 50% white, and 11 have a population which is over 60% white. Manhattan Community District # 5, which is a predominantly white district (in excess of 62% non-hispanic white), deserves special mention as it hosts 1,409 homeless families constituting 25.9% of all such families being housed by the City. It is also to be noted that 47.4% of the homeless families are sheltered in the 12 districts with a majority white population.

In terms of the latest official (1980) percentages predominantly minority districts

(in excess of 63% black and hispanic) host 39.7% of all homeless, whereas predominantly white districts host 44.6% homeless, and mixed districts host 14.6%. If 500 single men were placed in the Sumner Avenue Armory, the percentage of homeless, city-wide, in predominantly minority districts, would increase to 40%, whereas 43.7% would reside in predominantly white districts, and 15.3% in mixed districts. The City's ethnic composition is 43.9% minority, 51.9% non-hispanic white, and 4.3% other.

*Selection Process*

In one form or another, the City shelter program has been in existence since 1896. Recently, pursuant to a state court consent judgment that was entered into in August, 1981, entitled *Callahan, et al. v. Carey, et al.* (Index # 42582/79), and two State Appellate Court decisions, *Eldredge v. Koch,* 98 A.D.2d 675, 469 N.Y.S.2d 744 (1st Dep't 1983), and *McCain v. Koch,* 117 A.D.2d 198, 502 N.Y.S.2d 720 (1st Dep't 1986), the City, after much litigation, is now legally required to shelter all eligible homeless men, women, and families. One result of these legal obligations is that the City's homeless program, which is administered by the Human Resources Administration ("HRA"), has grown into the largest such program in the country. Currently HRA provides temporary shelter, food, clothing, non-emergency medical care, psychological treatment, and work programs to some 24,-000 homeless individuals. These individuals are located in the following shelters: 21 shelters for individuals, 5 family shelters, 4 family centers, 1 family residence, and 58 hotels (also used exclusively for families) at an annual cost to the City of 273 million dollars. This sum is matched by the New York State government, and doubled by the Federal government. Nevertheless, despite the enormity of the program, a critical need for space has developed as the homeless ranks continue to swell. For instance, the population of some shelters has quadrupled within one month of their opening. Moreover, in 1985 1,500 persons were added to the rolls of the homeless program, and 1,000 persons more will require City shelter in fiscal year 1986.

The HRA's current homeless facilities include converted hospitals, schools, day care centers, and various other types of buildings, including armories and hotel facilities, all of which come from primarily the State and various City agencies. Potential hotels are located by HRA through a periodic survey of all hotels situated within the metropolitan area. This survey is conducted four times yearly. Virtually no private property has been employed by HRA as homeless facilities.

With respect to State armories, HRA initiates the conversion process by requesting additional space, rather than specific buildings. HRA's space requests, which are determined by current need, are made to the New York State Department of Social Services ("D.S.S."), which then relays those requests to the New York State Department of Military and Naval Affairs. This latter department then determines how much armory space can be allocated to HRA. The criterion for armory space allocation by the State is military necessity and the obligations of long-term commercial contracts already entered into for specific armory space. Given the diverse needs of the military space is often allocated to HRA within functioning armories, though the quantity of such space fluctuates periodically. Entire state armories have also been made available to HRA. In those armories where HRA has been given partial space, such as the Park Slope Armory in Brooklyn, HRA has repeatedly requested additional square footage from the State.

The vast majority of HRA's remaining non-hotel facilities are taken from three distinct sources: the City's Board of Education, the Health and Hospitals Corporation, and computer listings of all vacant City buildings and property. This list is generated by the City's Division of Real Property. HRA also scours its own buildings for potential homeless space, and the City has advertised for private space in various newspapers.

HRA's ability to shelter the homeless in the future hinges upon the immediate availability of suitable space. Towards that end, HRA is now renovating the Sumner Avenue Armory, which it owns and in which it hopes to place 500 single men by January, 1987. This armory is located in Brooklyn Community District # 3, an area commonly referred to as Bedford-Stuyvesant, and is at the heart of plaintiff's suit. Even if Sumner Avenue were presently available, HRA's short term space problem would not be solved. Instead, HRA would still be faced with a 500–bed shortfall this winter, and no other sites are readily available. HRA may, therefore, be compelled once again to employ its own offices, uncompleted structures, and operating schools (during weekends) as temporary emergency shelters for the homeless.

For the long term, the City has embarked upon a construction program that aspires to build four new shelters in each of the five boroughs during the next two years. Pursuant to this program, the City has suggested that various vacant lots be used for such construction. These sites are, however, only suggested and will not be finally selected absent input from each Borough President. There is no question concerning the urgent need of the City to provide shelter program for the indigents. As said in *Williams v. Barry*, 490 F.Supp. 941, 943 (D.D.C.1980), *rev'd in part on other grounds*, 708 F.2d 789 (D.C.Cir.1983), in referring to the failure to provide shelters:

It is difficult to imagine a situation involving more egregious irreparable injury. The shelters provide indigents with housing, food, and sanitation. Their discontinuance would deprive the plaintiffs of these life support services. Without the shelters, these people will revert to alleys, heating grates, and garbage bins.

### Discussion

In its complaint,[1] plaintiff has asserted five federal claims. Since plaintiff seeks only equitable relief, it has a cause of action directly under the Fourteenth Amendment. *Gentile v. Wallen*, 562 F.2d 193, 197 n. 4 (2d Cir.1977). Moreover, plaintiff has also asserted a cause of action under 42 U.S.C. § 1983 by alleging a violation of the Equal Protection Clause, *French v. Heyne*, 547 F.2d 994 (7th Cir. 1976). The plaintiff's invocation of this clause raises a question as to whether it has established a cause of action under 42 U.S.C. § 1981. *See Guardians Assoc. of City of New York Police Dep't, Inc. v. Civil Service Com.*, 633 F.2d 232 (2d Cir. 1980), *aff'd*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), *cert. den., Civil Service Com. v. Guardians Assn.*, 463 U.S. 1228, 103 S.Ct. 3568, 77 L.Ed.2d 1410 (1983); *Croker v. Boeing Co.*, 437 F.Supp. 1138, 1181 (E.D.Pa.1977), *aff'd*, 662 F.2d 975 (1981). Plaintiff's other federal claims, *i.e.*, a claim under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, and a claim under Title VI, 42 U.S.C. §§ 2000d *et seq.*, are dismissed, the first for failure to state a claim and the second for lack of standing as fully explained in the note below.[2]

---

1. Early in the litigation the City requested this Court to abstain from deciding plaintiff's claims because the plaintiff was a party to a pending similar civil action in state court, *Vann v. Koch* (Index No. 29935/8 Kings Sup.). However, we do not deem the abstention issue to be properly before the Court since neither party disclosed the status of the case or of the parties in it.

2. To state a cause of action under 42 U.S.C. §§ 3601 *et seq.* (The Fair Housing Act), whose primary purpose is to proscribe discrimination in the sale, rental, financing or brokerage of private housing, *Otero v. N.Y. City Housing Auth.*, 484 F.2d 1122 (2d Cir.1973), the illegal action must have a discriminatory effect on the

availability of housing. *Southend Neighborhood Improvement Assoc. v. County of St. Clair*, 743 F.2d 1207, 1209–10 (7th Cir.1984). In this case plaintiff has not made a showing of such effects. Instead, plaintiff asserts that defendants' concentration of homeless shelters endangers the health and access to public education of minority host communities. This kind of alleged discrimination is clearly outside the purview of the Fair Housing Act. *See Mackey v. Nationwide Ins. Companies*, 724 F.2d 419, 422–25 (4th Cir. 1984).

Section 2000d of Title 42 of the United States Code, which is designed to prevent recipients of federal grants from administering such grants

The three surviving causes of action are based upon the establishment of intentional discrimination. *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977) (Equal Protection Clause not violated unless discrimination intentional); *General Bldg. Contractors Assn. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (§ 1981 not violated absent intentional discrimination); *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (where violation of equal protection asserted, plaintiff must establish invidious discrimination to be successful on her § 1983 claim).

## I. *Discrimination*

 Discrimination equals disparate impact. *De La Cruz v. Tormey*, 582 F.2d 45 (9th Cir.1978), *cert. den., Tormey v. De La Cruz*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). Disproportionality, which is generally shown by inferences drawn from statistics, is a form of discrimination when such disproportionality is "significant." *See Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). *See also, e.g., Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Moore v. Southwestern Bell Telephone Co.*, 593 F.2d 607 (5th Cir.1979). In this case we find that to determine ethnic discrimination in the placing of shelters, the universe or pertinent area must be the City as a whole, which is the extent of the City's jurisdiction, and it is not limited to the geographical region of Brooklyn. According to history, Brooklyn became a part of the City of New York in 1897. However, even if Brooklyn was considered as a separate entity, the result would be the same in determining the existence of any discrimination, either racial or otherwise.

 On the disproportionality or discrimination issue, plaintiff's only evidence is the City's own statistical data regarding Brooklyn, which appeared on plaintiff's map.[3] This data, discussed earlier in terms of percentages of homeless in districts of differing ethnic composition, is not on a city-wide basis and fails to show that the number of homeless in minority districts is significantly disproportionate to the number of homeless in the white districts. Moreover, plaintiff's map was inaccurate.

On the other hand, the City rests upon its own statistical data, which is citywide, together with the testimony of three witnesses: Harvey Robins, First Deputy Administrator of the HRA; Robert White, Deputy Commissioner for Family and Adult Services, HRA; and Kenneth Murphy, Executive Director of Crisis Intervention Services, HRA. There was also extensive testimony on the City's application of the Pearson's Correlation Coefficient which, according to Professor Drennan, showed that there is no statistical relationship between placement of the homeless and the ethnic composition of the host neighborhoods. It is not necessary, however, for the Court to rely upon the Pear-

in a discriminatory fashion, does grant private parties the right to sue, but only if they are either the intended beneficiaries of the federal program or the discrimination that the plaintiffs are suffering will negatively impact upon those intended beneficiaries. *Murphy v. Middletown Enlarged School District*, 525 F.Supp. 678, 709 (S.D.N.Y.1981), explaining *Caulfield v. Bd. of Ed. of the City of New York*, 583 F.2d 605, 610–11 (2d Cir.1978). *See also Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226 (7th Cir. 1980). In the instant case, plaintiff clearly is not an intended beneficiary of a federal homeless shelter program, nor will any discriminatory impact on plaintiff as a result of such shelter

program's administration harm the shelter residents.

3. Our discussion of this case is based upon inclusion of hispanic residents in the same category as black residents, although the better practice, according to the cases, is to treat them separately absent evidence indicating otherwise. *See, e.g., Keyes v. Second District No. 1*, 413 U.S. 189, 197–98, 93 S.Ct. 2686, 2692–93, 37 L.Ed.2d 548 (1973). If this inclusion had not been made, plaintiff's statistics would have much less force.

son's Correlation Coefficient, for the reason stated in the note below.[4]

■■■ This evidence indicates that there is no significant disparity between the number of homeless sited in predominantly white districts and the number of homeless sited in predominantly minority community districts.[5] In addition, it is clear that, predicated upon the absolute numbers heretofore discussed, plaintiff has failed to show on either a citywide or Brooklyn-wide basis that a significant disparity exists between the number of shelters placed in predominantly white and predominantly minority districts or the number of homeless housed in such districts. It is interesting to note also that the plaintiff has failed to show any harm resulting from the alleged discriminatory placement of shelters. *See N.A.A.C.P. v. Medical Center, Inc.*, 657 F.2d 1322 (3d Cir.1981). (Tr. 12/4/86, pp. 523, 525).

## II. *Intent*

■■■ In the federal claims asserted by the plaintiff, even were there discrimination in placing sites for the homeless, plaintiff is required to establish in addition that there was intentional or purposeful discrimination on the part of the defendants in making the selection. *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. Such evidence of intent can be direct or indirect. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights, supra.* To establish intent, the successful plaintiff need show

that the decisionmaker selected or reaffirmed a particular course of action, at least in part, "because of" and not merely "in spite of" its adverse consequences upon the identifiable group. *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. Something more than statistics is typically necessary to make this showing. *Village of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 563. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). When statistics alone are relied upon, their importance in the intent context is derived from the inference of discrimination which may be drawn therefrom. As Justice Stewart remarked in *Feeney;*

> an inference is a working tool, not a synonym for proof. When, ..., the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

442 U.S. at 279, n. 25, 99 S.Ct. at 2296, n. 25. Here, too, the inference fails and the consequences were unintentional.

■■ The plaintiff's case, which relies solely on statistics, is completely devoid of any evidence of intent—a conclusion which the testimony of plaintiff's witnesses in no way contradicts. (Tr. 12/1/86, pp. 164–66,

---

4. The Pearson's formula is a method of testing the mathematical relationship, if any, between two variables. The variables being tested here were the percentage of non-hispanic whites in a community district and the number of homeless. Both Mervyn Goldstein, Director of Analytic and Quantitative Support, Adult Services Agency, HRA, and Dr. Matthew Drennan of New York University testified that the Pearson formula indicated that there was no relationship between these two variables on either a citywide or Brooklyn-wide basis. The plaintiff, however, vigorously contested the applicability of Pearson's to the data in this case, contending that the four assumptions necessary for Pearson's use were not present. We seriously question the applicability of Pearson's Correlation Coefficient because it does not in this case recognize the population differentials between districts in

relation to the number of homeless in those districts. *Compare, e.g.,* Manhattan Community District # 5 with Manhattan District # 11 and Brooklyn Community District # 2.

5. As a threshold matter, and based upon both Dr. Drennan's testimony and the Court's own observations, community districts are the appropriate unit of measurement, rather than census tracts, for a disparity determination in this case. *See King v. Harris*, 464 F.Supp. 827, 839–40 (E.D.N.Y.1979), *aff'd w/o opinion, King v. Faymour Dev. Co.*, 614 F.2d 1288 (1979), *vac. and rem., Faymour Dev. Co. v. King*, 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980), *aff'd on rem. w/o opinion, King v. Harris*, 636 F.2d 1202 (2d Cir.1980).

197–98; Tr. 12/4/86, pp. 500–01, 509). Rather, the evidence shows that in the context of this case the City was compelled to make its homeless shelter siting selections based upon the availability of suitable shelter space, which unfortunately is diminishing as the critical needs of the homeless continue to grow. Under the circumstances, the City, in its search for shelters, had neither the choice nor intention to place the homeless in particular ethnic or even geographical areas (Tr. 12/2/86, p. 274) and whatever consequences have resulted from shelter placements were unavoidable.

■■■■ While intentional discrimination is required under 42 U.S.C. § 1981, the approach for establishing plaintiff's prima facie case differs from that used under the Fourteenth Amendment and § 1983.[6] Specifically, in § 1981 cases the Second Circuit has held that a showing by plaintiff of disparate impact shifts the burden of production, but not persuasion, to the defendant with regard to intent. *Martin v. Citibank, N.A.*, 762 F.2d 212, 217 (2d Cir.1985), citing *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In essence, then, this Circuit has adopted a three level proof procedure in these cases. First, a plaintiff which demonstrates that it belongs to a racial minority that has been discriminated against is entitled to a presumption of intent regarding that discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Second, the defendant can then rebut this presumption by producing enough evidence to raise a genuine issue of fact as to whether such disparate impact resulted from a race neutral reason. *Id.* Third, once the

intent presumption is rebutted, a plaintiff must then demonstrate that defendant's justification is more likely than not pretextual. *Id.* at 255–56, 101 S.Ct. at 1094–95.

As our previous discussion of intent makes clear, there is no evidence to suggest that the City's justification for siting homeless facilities was pretextual and consequently plaintiff's § 1981 claim must fail.

### III. *Pendent Jurisdiction*

■■■■ It is true that all of plaintiff's state law claims, as heretofore mentioned, arise out of the same nucleus of operative fact as do plaintiff's federal claims. The Court accordingly has pendent jurisdiction over such claims, *see United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and, in its discretion, believes it is appropriate to exercise that jurisdiction in this case.

■■■■ Clearly, plaintiff has stated a cause of action directly under Article I, § 11 of the New York State Constitution, which is essentially New York State's counterpart to the Equal Protection Clause of the Fourteenth Amendment. *McMinn v. Town of Oyster Bay*, 66 N.Y.2d 544, 498 N.Y.S.2d 128, 488 N.E.2d 1240 (Ct.App. 1985); *People v. New York City Transit Authority*, 59 N.Y.2d 343, 465 N.Y.S.2d 502, 452 N.E.2d 316 (Ct.App.1983). As with its Fourteenth Amendment claim, plaintiff's success here is predicated upon a showing of intentional discrimination, *People v. Goodman*, 31 N.Y.2d 262, 338 N.Y. S.2d 97, 290 N.E.2d 139 (Ct.App.1972), which it has failed to do.

■■■■ The plaintiff's remaining state law claims need not detain the Court. Arti-

---

**6.** Plaintiff's § 1981 claim also differs from those asserted under 42 U.S.C. § 1983 and the Fourteenth Amendment in that the former claim requires a showing of racial discrimination. *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968 (10th Cir.1979). Though still an open question in this circuit, the weight of authority indicates that hispanics constitute a "race" for the purposes of § 1981. *See Rodriguez v. Chandler*, 641 F.Supp. 1292, 1301, 1301 n. 36 (S.D.N.Y. 1986). *See also Bullard v. Omi Georgia, Inc.*, 640 F.2d 632 (5th Cir.1981); *Garcia v. Rush*

*Presbyterian-St. Luke's Medical Center*, 80 F.R.D. 254 (N.D.Ill.1978), aff'd, 660 F.2d 1217 (7th Cir. 1981); *Rodriguez v. American Parts System*, No. 86–3904, slip op. (E.D.Penn. Nov. 19, 1986) [Available on WESTLAW, DCTU database]; *Ortiz v. Bank of America*, 547 F.Supp. 550 (E.D.Cal. 1982); *Apodaca v. General Electric Co.*, 445 F.Supp. 821 (D.C.N.M.1978). *But see Vera v. Bethlehem Steel Corp.*, 448 F.Supp. 610 (M.D. Penn.1978); *Jones v. United Gas Improvement Co.*, 68 F.R.D. 1 (E.D.Penn.1975).

cle II of the New York State Constitution, which deals with suffrage, is clearly inapplicable to this case as a matter of law. *See* Article II, Constitution (McKinney's 1982). So too, plaintiff has failed to state a cause of action pursuant to Article 15, § 296 of New York's Executive Law because plaintiff seeks neither the type of educational nor housing opportunity delineated under it. *See Campbell v. Barraud,* 58 A.D.2d 570, 394 N.Y.S.2d 909, 913 (2d Dep't 1977).

The foregoing constitute the Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. Accordingly, the complaint is dismissed and judgment entered for the defendants.

SO ORDERED.